IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SARAH SEBREN,<br>              Plaintiff<br><br>        v.<br><br>CASBY HARRISON, III,<br>              Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. 1:18-cv-00667-MSM-PAS

**MEMORANDUM AND ORDER**

Mary S. McElroy, United States District Judge.

## I.      INTRODUCTION

This wage dispute is before the Court on the plaintiff's Motion for Partial Summary Judgment (ECF No. 62) and the defendant's Objection to it (ECF No. 70). At one time, Casby Harrison's law firm employed Sarah Sebren, first as a secretary/assistant, then as an attorney.  She sued under the Fair Labor Standards Act ("FLSA") (Count I), 29 U.S.C. § 216(b), the Rhode Island Minimum Wage Act ("RIMWA"), R.I.G.L. § 28-12-1 *et seq.* and the Rhode Island Payment of Wages Act ("RIPWA") R.I.G.L. § 28-14-19.2(b) (Count II)[1].  She complains that Mr. Harrison misclassified her as an independent contractor when she was, instead, an employee,

---

[1] Section 28-12-1 *et seq.* sets forth the law with respect to payment of minimum wages in Rhode Island; § 28-14-19.2 authorizes a private right of action.

1

and, as such, failed to pay her at least minimum wage for all the hours she worked and failed to pay her an overtime premium for hours worked more than 40 in any one week.[2]  Mr. Harrison filed counterclaims, charging that Ms. Sebren stole a file related to a  personal injury client ("client") and that she breached her contract with him (among other wrongs)[3] by appropriating that client to her own law practice after leaving his office.  (ECF No. 14).  Before the Court now is Ms. Sebren's motion for partial judgment on Counts I and II, and for summary judgment on Mr. Harrison's counterclaims against her.  Count III of the Amended Complaint, alleging unjust enrichment, was previously dismissed (ECF No. 46) as were class allegations (*see* Text Orders of April 30, 2019, and July 22, 2019).

Jurisdiction lies pursuant to both 28 U.S.C. §§ 1331 and 1332, as the parties are diverse:  Ms. Sebren is a citizen of Massachusetts, Mr. Harrison is a citizen of Rhode Island, and the damages claimed are in excess of the $75,000 required threshold.  The case also arises under federal law, thus presenting a federal question.

For the reasons below, the Court GRANTS Ms. Sebren's Motion for Partial Summary Judgment with respect to liability on Counts I and II but DENIES summary judgment on all issues related to damages.  As for state penalties for the

---

[2] Minimum wage between January 1, 2016 and January 1, 2018, was Nine ($9.60) Dollars per hour.  R.I.G.L. § 28-12-3(h).  There are lesser damages sought as a result of the misclassification, such as compensation for Ms. Sebren's having to pay 100% of her Social Security and Medicaid health contribution.

[3] The allegations that Ms. Sebren took the client away from him and secured a sizeable settlement without sharing the fees with him underlie Mr. Harrison's counterclaims for breach of contract, usurpation of opportunity and breach of loyalty, tortious interference with his attorney-client relationship, theft of the file, and extortion.

misclassification violation, the Court imposes a penalty of three thousand ($3,000.00) Dollars upon Mr. Harrison.  As to Mr. Harrison's counterclaims, the Court GRANTS summary judgment to the plaintiff on that portion of counterclaim I that alleges theft of the file and settlement of the case without his permission, and on counterclaims II through VI.  The Court DENIES summary judgment on that portion of counterclaim I in which Mr. Harrison seeks a portion of the contingency fee.

## II.    BACKGROUND

The facts that follow are undisputed unless otherwise indicated.[4]  Ms. Sebren was first employed by Mr. Harrison in July 2008 as "an administrative assistant or paralegal."  (ECF No. 7 ¶ 23).  She helped answer the phone, maintained files, photocopied, assisted with bookkeeping, maintained office machines, and carried out similar tasks.  While the tasks she did were traditional, the terms of her employment about payment were not.  Both parties agree that while Ms. Sebren's hourly wage at that time was $30.00, she was to be paid only for hours that Mr. Harrison could bill to clients, known as "billable time."  Outside those hours passed on to a particular client, they agreed she would work for no pay.  Mr. Harrison maintains that the $30/hour rate was "far in excess of the customary hourly rates for secretaries, clerks,

---

[4] Ms. Sebren's Statement of Undisputed Facts (ECF No. 63) was responded to by Mr. Harrison (ECF No. 71).  In addition, both parties submitted affidavits in support of their summary judgment positions and both were deposed.  (ECF Nos. 71, 63-1, 63-3, 63-30).  Other exhibits, including an affidavit from the personal injury client, answers to interrogatories, a deposition from another employee, wage, and time records kept by Ms. Sebren, and a number of emails, are part of the record.

administrative assistants and the like [,]" to compensate her for hours spent on non-billable cases for which she was not paid directly.  (ECF No. 71, ¶ 87).

In about July 2017, working life changed for Ms. Sebren and so did the relationship.  She was admitted to the Rhode Island Bar and became an associate attorney in Mr. Harrison's law office.  Her rate of pay changed by agreement to $50.00 per hour, but again only for hours that could be billed to a client.  Hours that were not "billable" to a client would not be paid at all.

The parties agree that Ms. Sebren was not paid a salary and was never paid a premium rate for overtime, holiday, or Sunday work.  From time to time, Ms. Sebren submitted time records to Mr. Harrison for work that could be billed to a client, and he paid her for those hours at either the $30 or $50 per hour rate.  Mr. Harrison did not keep any records of Mr. Sebren's work time, nor did she keep a record of time for which she was not paid.  He maintained nothing resembling regular paydays nor did he provide her with earnings statements.   Because he classified her as an independent contractor, he deducted nothing from her pay, transmitted no taxes on her behalf, and made no contributions as an employer to any government compensation schemes.  (ECF No. 14, ¶¶ 9, 24.)  He filed Internal Revenue Service Form 1099s for tax years 2015, 2016 and 2017,[5] treating her as an independent contractor.  (ECF Nos. 63-27, 63-28, 63-29.)  The sum of those 1099s was $61,081.

_____

[5] These are the relevant years, as the statute of limitations that govern these statutory wage claims is two or three years, depending on the employer's state of mind.  *See* discussion of "willfulness," *infra* at Part IV(A)(2)(a).  As this action was filed in 2018, the forms for tax years 2015 ($8,925 total paid), 2016 ($21,730 total

At some point in July 2017, a prospective client contacted Harrison Law Associates ("HLA"). He had been involved in a serious automobile accident. Ms. Sebren answered that first call and, from that time until she left HLA, she was the only one from the practice who had any meaningful contact with the client. She interviewed him in the hospital and later at a nursing home, she obtained medical records, and she performed other case preparation functions. Ms. Sebren described her contact with the client as very frequent: she ran his errands, performed personal tasks for him, spoke to him constantly, and was at his "beck and call."[6] Mr. Harrison agrees that his only contact with the client was taking a telephone message for Ms. Sebren on one or two occasions. He never met the client.

On December 29, 2017, Ms. Sebren left the Harrison law practice. At that time, she had in her possession the client's file, which she had been keeping at home while providing legal services as a law associate at HLA. She has submitted evidence that she worked on the case at home sometimes, and Mr. Harrison, while maintaining that the bulk of her work was done at the office, does not dispute that she at first possessed the file appropriately. At some point very soon after, the client called Ms.

---

paid) and 2017 ($30,426 total paid) are the only relevant ones. (ECF Nos. 63 ¶ 60, 63-27, 63-28, 63-29).

[6] The deposition of Susan Morin, a social work counselor who was introduced to the client by Ms. Sebren, affords a view into the services provided by both her and Ms. Sebren. Knowing that the client represented a large future settlement, both were eager to satisfy his demands, which were many and insistent. Clearly a difficult person to deal with, he would become irate if he could not immediately contact Ms. Sebren. She ran errands for him, dropped things off to him day and night, grocery shopped for him, and answered his "nonstop" phone calls. (ECF No. 63-11). The two women spoke often about the case, sometimes twice each day, often for hours at a time.

Sebren and she informed him she had left the Harrison practice.  He chose to follow her and the two executed a written retainer agreement which covered, among other things, her contingency fee of one-third the recovery.  (ECF No. 63-31.)  Ms. Sebren ultimately settled the case for $1 Million, the coverage limit.  She has disbursed the settlement payment to the client and retained the contingency fee.  Among his other claims, Harrison has counterclaimed for a portion of that fee.

## III.    STANDARD OF REVIEW

Motions for summary judgment brought under Fed. R. Civ. P. 56 require a claim-by-claim review to determine whether there exists, relative to each claim, a genuine dispute of material fact.  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.  A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000).  If there are genuine disputes of material fact summary judgment must be denied and the opponent of summary judgment is entitled to present the case to a jury on that claim.

## IV.  ANALYSIS

### A.   Plaintiff's Wage Claims

#### 1.  Liability

The initial inquiry in a wage case claiming FLSA violations is whether the person claiming its benefits was an "employee" or an "independent contractor."  The FLSA presumes that everyone employed is an "employee," and it defines a "covered

employee" as "any individual employed by an employer," with certain limited exceptions. 29 U.S.C. § 203(e)(1). *Moreau v. Medicus HealthCare Solutions, LLC*, Civil No. 20-cv-1107-JD, 2021 WL 919869, at *1 (D.N.H. March 10, 2021). An entity is said to "employ" a person under the FLSA if it "suffers or permits" the person to work. 29 U.S.C. § 203(g). While the determination is fact-intensive, it is ultimately a question of law. *McFeeley v. Jackson St. Entm't*, LLC, 825 F.3d 235, 240 (4th Cir. 2016); *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988); *Pizzarelli v. Cadillac Lounge, L.L.C.*, C.A. No. 15-254 WES, 2018 WL 2971114, at *2–3 (D.R.I. Apr. 13, 2018).

Rhode Island's test to determine whether a person is an employee under the RIPWA is broader than that under the FLSA. Rather than look to actual control, it focuses on "the employer's right or power to exercise control over the method and means of performing the work[.]" *Cayer v. Cox Rhode Island Telecom, LLC,* 85 A.3d 1140, 1144 (R.I. 2014). *Accord, Pizzarelli* at *6 (look to "whether [the employer] had the right to [control].").

Mr. Harrison does not contest that Ms. Sebren was an employee of HLA until she left his employ in December 2017, and she meets the definition of "employee" under both state and federal law. Further, he agrees that she was misclassified as an independent contractor before her admission to the bar. As for liability under the FSLA and the RIPWA, the parties have entered a stipulation agreeing that Ms. Sebren was paid as an independent contractor even though she qualified as an employee, and Mr. Harrison has admitted that he never paid her as an employee

(ECF No. 14, ¶ 24). Thus, until she passed the bar, liability is clear for violating both the FLSA and the RIPWA for misclassifying her.

Once she passed the bar examination and was admitted to the practice of law, the situation changed in a way that affects liability. Mr. Harrison continued to violate the RIPWA because Ms. Sebren's new status as an attorney did not exempt her from the protection of that Act. Professional employees are exempted from the RIPWA only if they are paid a salary of at least $200 per week, which she was not. R.I.G.L. § 28-12-4.3(a)(4). There is no dispute that she was never a salaried employee.

The FLSA, however, exempts professional employees no matter if they were paid a salary. 29 U.S.C.A. § 213. That would ordinarily lead to a finding of no liability under the FLSA after she became an associate attorney, except that Ms. Sebren claims that she performed professional functions only part of the time after July 2017. She claims, and has produced evidence to support that claim, that a substantial part of her work continued to be the administrative/secretarial/paralegal work that she had done before becoming an attorney. Mr. Harrison counters with evidence that the non-lawyering work consisted of routine tasks done by all attorneys in a small practice and did not change the nature of her job as "professional." Although the question of whether an employee's duties fall within the professional exemption is a question of law, how the employee actually spent the time is a question of fact. *Withrow v. Sedgwick Claims Management, Inc.,* 841 F. Supp. 2d 972, 975 (S.D.W.Va. 2012). Because there is a genuine dispute about how Ms. Sebren spent

her post-admission time, summary judgment on the professional exemption is precluded.

Based on the above, the Court GRANTS summary judgment with respect to liability for violating the FLSA (Count I) and RIPWA (Count II) for the period before Ms. Sebren's admission to the bar, and for a violation of the RIPWA thereafter until she left HLA on December 29, 2017.  As discussed below, the parties have a genuine dispute of fact about whether Ms. Sebren worked any hours without being paid at least minimum wage and about whether she worked any overtime hours.  Summary judgment on liability, therefore, lies *only* with respect to the failure to treat Ms. Sebren as an employee under the FLSA prior to her admission to the bar and to that same failure under the RIPWA for the entire time of her employment.  As discussed below, genuine disputes of material fact preclude summary judgment for the plaintiff on damages.

### 2. Damages

All questions related to damages, compensatory or liquidated, involve genuine disputed issues of material fact and for the issues identified below, Ms. Sebren's motion for summary judgment is DENIED as to each of them.

### a. Limitations Period

Ordinarily, the FLSA statute of limitations is two years, and Ms. Sebren could therefore recover only any wages owed to her for work performed between December 10, 2016, and the day she filed her complaint on December 10, 2018. However, the FLSA provides that the limitations period is extended to three years if

the employer's violation was willful.  The question is whether the evidence on willfulness warrants summary judgment for the plaintiff or, alternatively, requires submission to a fact-finding jury.

The standard for willfulness is well settled.  Willfulness means more than mere negligent violation of the law.  *Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 34 (1st Cir. 2003).  Willfulness means either with intent to violate the law or with "reckless disregard" of the obligations of the law.  *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128-29 (1985).  Although *Thurston* established this standard under the Age Discrimination in Employment Act ("ADEA"), an identical definition was soon thereafter applied to the FLSA.[7]  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 130 (1988) (affirming the Third Circuit's use of "knew *or showed reckless disregard for the matter of whether* its conduct was prohibited by the FLSA") (emphasis original).  *See Acosta Colon v. Wyeth Pharm. Co.*, 364 F. Supp. 2d 24, 27 (D.P.R. 2005), *recons on other g'nds* 2006 WL 408094 (March 1, 2006) (applying *Thurston* standard to FLSA wage action). It means more than just awareness of the law generally "and its potential applicability in the workplace."  *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 721 (1st Cir. 1994) (ADEA case).

Mr. Harrison denies that he knew or recklessly disregarded state or federal law.  (ECF No. 71, ¶ 86).  Ms. Sebren relies on two things to show willfulness.  She

---

[7] The *Thurston* formulation has since become the touchstone of willfulness in other statutory contexts.  *Fryer v. A.S.A.P. Fire & Safety Corp., Inc.*, 658 F.3d 85, 91-92 (1st Cir. 2011) (Uniformed Services Employment and Reemployment Rights Act); *Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 33 (1st Cir. 2003) (Family and Medical Leave Act).

contends that the failure of Mr. Harrison to keep time records shows intentional violation and that his status as an attorney must have made him aware that he was violating the law. While the facts–that he failed to keep time records and that he is an attorney–are true and undisputed, an inference of willfulness is not the only one that could reasonably be drawn. *Compare Chao v. Hotel Oasis*, 493 F.3d 26, 35 (1st Cir. 2007) (finding sufficient evidence of willfulness where in addition to the failure to keep accurate time records, the employer failed to record tips, paid employees off the books, and "intentional[ly] manipulat[ed]" records.)   The evidence of willfulness is genuinely disputed and must be decided by a factfinder.

### b.  Minimum Wage and Overtime

In this case, the question of whether there were any specific violations of the rules governing minimum wage and overtime is the subject of vigorous dispute, as is the amount of damages if there were violations. Damages here, assuming wage violations, are not "readily calculable based on the undisputed facts," *McGrath v. City of Somerville*, 419 F. Supp. 3d 233, 264 (D. Mass. 2019), and therefore must be determined by a jury. While Mr. Harrison does not contest that he was subject to paying Ms. Sebren minimum wage and overtime wages, he denies that there are any actual damages due. He contends that what he did pay her, specified in the 1099s, was adequate to cover minimum wage for the hours that she worked. He also maintains that in fact she did not work any hours over 40 in any week and was thus not entitled to overtime.

Ms. Sebren contends she worked an average of 50 hours per week for 49 weeks. She has also produced an affidavit from a co-worker who states she "worked hard." Neither party kept complete actual time records.[8]   The legal burden to keep records was clearly on Mr. Harrison.   *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 448 (2016).   Ms. Sebren need only go forward with the burden of proving that "she performed work for which she was not properly compensated," and she may prove that by direct or inferential evidence.   *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946).   That is a burden the First Circuit has held is "minimal."   *Sec'y of Labor v. DeSisto*, 929 F.2d 789, 792 (1st Cir. 1991).   Mr. Harrison's failure to keep records, however, does not mean he has no basis with which to raise a genuine issue of fact as to how many hours she worked.   He has presented a counter-affidavit that swears that he himself was in the office much of the time, that he never saw Ms. Sebren or her automobile at the office on weekends or evenings, that she left the office often for personal errands, that he never observed her working more than a normal [8-hour] day, and that her work during non-regular business hours was "rare and did not result in additional [sic] or overtime." (ECF No. 71).   He gave deposition testimony that he was frequently in the office into the late night, that usually at night he was alone, that while she could have come and left the law office without passing his door, he would have been aware of her presence in the office.   (ECF No.   63-1).   He acknowledged that both he and Ms. Sebren customarily worked with their doors

_____

[8] Ms. Sebren kept time sheets only for time spent on "billable" clients and was paid for that time at the $30/hour and $50/hour rates.   So for the only time when actual time records were kept, she was compensated at more than minimum wage.

closed.  (ECF 63-1, p. 27).   This evidence raises a question for the finder of fact and, although the Court has found that Ms. Sebren was entitled by law to the overtime protection of both the FLSA and RIPWA, it cannot settle the issue of whether she worked any overtime hours.  Resolution of these disputes depends on the credibility attached to each witness, a task beyond the scope of summary judgment.  *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000) (courts should not engage in credibility assessments at the summary judgment stage).  While the plaintiffs may be entitled to a "less stringent standard of proof" because Mr. Harrison lacks records, it remains that there are foundational questions of material fact on the issues of uncompensated time and overtime that cannot be resolved on a motion for summary judgment.

### 3.  Exemption from FLSA as a Professional[9]

Ms. Sebren contends that she was entitled to the protection of the FSLA even after passing the bar examination because her primary work remained that of an administrative employee and not an attorney.  Thus, she reasons, the professional exemption for lawyers does not apply.  *See*, 29 U.S.C.A. § 213(a) (employees who work in a "professional capacity" are exempt from minimum wage and maximum hour provisions) and 29 C.F.R. § 541.304 (regulation declaring practicing lawyers exempt).  She has produced some evidence, in the form of invoices, showing a ratio of

---

[9] The professional exemption in state law does not apply to Ms. Sebren because it is undisputed that at no time was she paid a salary of at least Two Hundred ($200.00) Dollars per week.  R.I.G.L. § 28-12.4.3(a)(4).

administrative work to legal work.  Only certain activities, requiring the exercise of independent legal judgment, are necessarily the practice of law.  *Lola v. Skadden, Arps, Slate, Meagher & Flom, LLP*, 620 Fed. Appx. 37, 44 (2d Cir. 2015).  Mr. Harrison has produced evidence that the tasks she characterizes as "administrative" are typically performed by attorneys in a very small practice such as his.  This dispute, like those above, is for a factfinder to decide.

### 4.  <u>Penalties</u>

Unlike the measure of wage damages, the penalties to which Mr. Harrison is subject are readily calculable.  The FLSA provides a penalty only upon criminal conviction or for child labor violations.  29 U.S.C.A. § 216(a), (e).  But the RIPWA, on the other hand, provides a civil penalty in an amount between $1,500 and $3,000 "for each misclassified employee for a first offense[.]"  R.I.G.L. § 28-14-19.1(a)-(b).  The penalty for each subsequent offense is up to $5,000.  *Id.* § 28-14-19.1(b).  Further, the Act permits recovery for penalties in a private cause of action.  R.I.G.L. 28-14-19.2(a).  Penalties are classified by the statute as "equitable relief," and thus would be determined by the Court.[10]

Ms. Sebren argues that because she was entitled to be paid weekly by virtue of R.I.G.L. § 28-14-2.2(a), Mr. Harrison committed a "subsequent offense" each week that he classified her as an independent contractor, a total of 106 weeks.  She seeks

---

[10] Section 28-14-19.1(c) contemplates that the penalty would be imposed by the Director of Labor and Training, but § 28-14-19.2, authorizing the private cause of action, allows recovery through a lawsuit of any penalty that could have been imposed in an administrative hearing.

a penalty of $3,000 for the first week and $5,000 for each of 105 weeks thereafter, for a total of Five Hundred Twenty-Five Thousand ($525,000) Dollars.  While it is easy to see why a plaintiff might attempt to calculate penalties that way, she cites no authority for this manner of calculation.

This is a question of law, requiring an interpretation of the statutory phrases "for each misclassified employee" and "subsequent offense."

Section 28-14-19.1 provides:

> (b) In addition to any other relief to which any department or an aggrieved party may be entitled for such a violation, the employer shall be liable for a civil penalty in an amount not less than one thousand five hundred dollars ($1,500) and not greater than three thousand dollars ($3,000) *for each misclassified employee for a first offense* and up to five thousand dollars ($5,000) *for each misclassified employee for any subsequent offense,* which shall be shared equally between the department and the aggrieved party.

(emphasis supplied).  The statute by its plain terms provides that the penalty is assessed for each misclassified *employee*, not for each manifestation of misclassification.  If that misclassified employee represents a first offense, the penalty is up to $3,000.  If the misclassified employee represents a subsequent offense *of misclassifying employees*, the penalty increases to $5,000.

The plaintiff's reading would have the Court reverse the phraseology in the statute, to apply it as if it read, "[$1,500 to $3,000] for a first offense regarding a misclassified employee and [up to $5,000] for each subsequent offense regarding that employee." But the statute clearly imposes the penalty for the misclassification itself

and that is a single continuing offense with respect to any given employee.[11]

This Court's interpretation is consistent with the Rhode Island canon of statutory construction that mandates attention to the plain words and ordinary meaning of a statute. *Solas v. Emergency Hiring Council of State*, 774 A.2d 820, 824 (R.I. 2001).  In addition, it is consistent with the Rhode Island Supreme Court's philosophy in an analogous situation.  In *Interstate Navigation Co. v. Division of Public Utilities*, 824 A.2d 1282 (R.I. 2003), the Court reversed the decision by the Division of Public Utilities and Carriers to impose a fine of $22,000 for a witness' refusal to answer 22 questions at a single hearing.  The relevant statute permitted a $1,000 fine for "failure to perform a legal duty." *Id.* at 1287-88.  The Court refused to permit multiple fines for what was essentially the same continuing violation. *Id.*  The Rhode Island General Assembly is aware of how to impose a penalty for each instance of violation, *see* R.I.G.L. § 2-1-24 (providing for a penalty of up to $500 per day for wetlands violations "for each day during which the violation is repeated") and § 46-25-25.2(a) (providing a penalty of up to $25,000 "per day for each violation.")  It chose not to do so in the RIPWA.

Although the Court does reject the idea of a separate penalty for each week in which Ms. Sebren was treated as an independent contractor, it has taken the lengthy period of this violation into account, as well as Mr. Harrison's ability as an attorney to determine whether he was violating the law, and therefore imposes the maximum

---

[11] Interestingly, the FLSA's civil penalty for child labor violations is, in much clearer language, consistent with this interpretation by providing a penalty "$11,000 for each employee who was the subject of such a violation."  29 U.S.C.A. § 216(e).

penalty of $3,000 for this violation, payable one-half to Ms. Sebren and one-half to the Rhode Island Department of Labor.

## B.  The Counterclaims

Mr. Harrison presses six counterclaims.  All involve his contention that Ms. Harrison's actions leading to her sole representation of the client, and the disposition of funds from the settlement of the client's case, were wrongful.  He maintains that from the outset she "inveigled" the client, stole the client file, breached both her contractual obligations and her duty of loyalty to him and his law practice, and unlawfully kept the contingent fee to herself.   Each of these counterclaims presents issues of state law.  The Court addresses the counterclaims in turn below.

### 1. Breach of contract

Under Rhode Island law, a breach-of-contract claim has the following components: (1) that there was a contract between the parties; (2) that the party sued failed to perform one or more obligations required by the contract; and (3) that the failure harmed the other party. *Fogarty v. Palumbo*, 163 A.3d 526, 157-58 (R.I. 2017). Mr. Harrison's breach-of-contract claim founders and sinks at the first step.  He has neither alleged nor proffered evidence to support a contract that governed Ms. Sebren's representation of former clients of HLA once she left his employ.  All the material submitted, including the Sebren and client affidavits, demonstrates that the client engaged Ms. Sebren of his own accord–or at least Mr. Harrison has failed to raise a legitimate evidentiary dispute otherwise.  In addition, it is clear from the undisputed facts that the client contacted Ms. Sebren and was himself the instigator

of a new attorney-client representation.  (ECF No. 63-30).  Once Ms. Sebren entered an attorney-client relationship with the client, which she did by a retainer agreement, (ECF No. 63-31), she had full authority to settle the case without Mr. Harrison's permission.

The only aspect of the first counterclaim that is not so quickly disposed of is that portion alleging breach-of-contract in her failure to pay him a portion of the contingency fee.  Mr. Harrison testified at deposition that the parties had an agreement in which they would split the contingency fees from this client's case 50-50.  (ECF 63-1, pp. 64-65).  Ms. Sebren denied at deposition that he ever offered her a 50-50 split.  (ECF No. 63-3, p. 55).[12]  It is undisputed that the case settled after Ms. Sebren left Mr. Harrison's employ, and there is no evidence of any explicit agreement covering that circumstance, but the existence and terms, if any, of an agreement between the parties is a dispute that must be settled by a jury.[13]

---

[12] Some of Ms. Sebren's invoices have annotations subtracting an amount for "1/2 shared risk for [client]" and carrying the annotation "1/2 [client]."  There is a third annotation, "Total owed for this period, not including under-billed times as noted on previous payment requests, to be paid upon [client] settlement as agreed." (ECF 63-25, pp 6,7,9)

[13] Without an enforceable contingency agreement, Mr. Harrison may have a claim that again must be resolved by a factfinder. When an attorney retains a client after leaving a law practice, the practice is entitled to be reimbursed for any expenses and the value of the time the former employee spent on the case.  *Wistow & Barylick v. Bowen*, No. Civ. A. PC 94-6341, 2002 WL 1803926 (R.I. Super. July 24, 2002).  Mr. Harrison contends that most of the time spent preparing the case was under HLA's auspices.  (ECF 71, ¶ 73).  Ms. Sebren, while acknowledging that he is entitled to some quantum meruit amount (ECF No. 7, ¶ 64), disputes his assertion.  Mr. Harrison also testified that he did some work himself on the client's case, consulting with Sebren and giving her advice.  (ECF 63-1, pp 58-60)  Both parties will be able to present evidence of what time preparing the client's case was paid for, if any, by Mr. Harrison, and what other value HLA provided to the case.  *See, e.g., Meehan v.*

## 2.  Usurpation of Opportunity and Breach of Loyalty

Mr. Harrison contends that Ms. Sebren breached "her fiduciary duties of good faith and loyalty" to HLA.  Again, all the evidence demonstrates that, while she was employed by HLA, Ms. Sebren carried out the duties assigned to her in a way that furthered the interests of her employer.  She was assigned the client's case, and Mr. Harrison concedes he directed her to have all contact with the client, which she did. Both she and the client affirm that she carried out those duties in a way that was designed to keep the client happy and satisfied with HLA.  Not until after she left HLA did her interests diverge from Mr. Harrison's. Once she entered an independent attorney-client relationship with the client, initiated by the client, her fiduciary obligation to HLA ceased to exist. Former employees are entitled, absent noncompete contracts, to do business with the clients of the former employer—even to solicit them— so long as the conduct occurs post-departure.  *Long v. Atlantic PBS, Inc.*, 681 A.2d 249, 253 (R.I. 1996) (where client decided to follow contractor to new construction firm, "no reasonable factfinder could conclude that Long breached any duty to Atlantic about the post-departure contracts he had obtained for R.J.")  Moreover, it would appear from state law that denial of opportunity is a doctrine protecting corporations.  *A. Texeira & Co, Inc. v. Teixeira*, 699 A.2d 1383, 1386 (R.I. 1997) (doctrine "prohibits a corporate fiduciary from diverting a business opportunity away from the corporation and taking it for himself or herself.")

---

*Shaughnessy*, 535 N.E.2d 1255, 1269 (Mass. 1989) ("fair charge" due the law firm previously employing the attorneys under partnership agreement means attorney's billable rates times the hours expended, plus expenses.").

The Court GRANTS summary judgment to Ms. Sebren on the second counterclaim.

### 3.  Tortious Interference

Tortious interference with contract consists of the following elements: (a) the existence of a contract, (b) the wrongdoer's knowledge of a contract, (c) the intentional interference with that contract, and (d) damages resulting.  *Belliveau Building Corp. v. O'Coin*, 763 A.2d 622, 627 (R.I. 2000).   The plaintiff need not show that the wrongdoer acted with malice but must show that the wrongdoer "caused harm in [acting intentionally], and, ultimately, that they acted 'without justification,' or for an 'improper' purpose." *Id.* at 628.  Absent a noncompete agreement, which does not exist in this case, a departing employee may continue to do business with a client who follows the employee, so long as the employee has not actively and "greatly abuse[d] the trust of his employer in dealing with customers" while employed. *Rego Displays, Inc. v. Fournier*, 379 A.2d 1098, 1101 (R.I. 1977).  There is no evidence here that Ms. Sebren acted wrongfully or that she caused harm.   It is clear from the client's affidavit, supported by the fact that Mr. Harrison had not even met the client, that the client would have cut its ties to HLA in any event once Ms. Sebren had left the practice.

The tortious interference claim has not been supported and the Court GRANTS summary judgment to Ms. Sebren on the third counterclaim.

### 4. Theft

Mr. Harrison has not submitted any competent evidence putting into dispute Ms. Sebren's assertion that the file was in her possession with permission as part of her representation of the client on HLA's behalf.  Once she left HLA, very little time elapsed before she was retained by the client and would be, by virtue of that retainer, entitled to possess the file (which, after all, is the property of the client).  There is no genuine issue of material fact which could support any conclusion other than judgment for Ms. Sebren on this count and the Court therefore GRANTS summary judgment for her on the fourth counterclaim.

### 5. Extortion and Abuse of Process

Mr. Harrison contends that an email from Ms. Sebren to him on January 15, 2015, constituted extortion and that her threat to file a class action constituted abuse of process.  The text of the email was: "I am willing to offer to compromise before Bob's initiates [sic] class action claims, and before I request that those include claims for hostile work environment, which we can easily show …  I hope you speak to your family and friends, and consider all possible consequences …" (ECF No. 63-32).  This is not extortion.  If it was meant as an inducement urging Mr. Harrison to settle this case, it was a legitimate communication.  "Extortion" requires an intent to do harm, with an element of malice.   *Marcil v. Kells*, 936 A.2d 208, 214 (R.I. 2007).  Mr. Harrison's inference that the reference to "family and friends" and "all possible consequences" carried some sort of threat of unlawful activity, is too much of a stretch for this Court to indulge.

As for abuse of process, that occurs when a legal proceeding becomes "perverted to accomplish an ulterior or a wrongful purpose for which it was not designed." *Butera v. Boucher*, 798 A.2d 340, 353 (R.I. 2002) (quoting *Clyne v. Doyle*, 740 A.2d 781, 783 (R.I. 1999)).   It applies only when its purpose is to obtain a collateral advantage "not properly involved in the proceeding itself … by the use of the process as a threat or a club."  *Id.*  When the process is used only to accomplish the result for which it was intended, which it was here, there is no abuse of process.  There are no facts alleged that could support an abuse of process determination.

The Court therefore GRANTS summary judgment for Ms. Sebren on the fifth and sixth counterclaims.

## V.  CONCLUSION

Ms. Sebren's Motion for Partial Summary Judgment (ECF No. 63) is GRANTED in part and DENIED in part as detailed above.

IT IS SO ORDERED:

Mary S. McElroy,
United States District Judge
August 5, 2021