## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| _____ ) | |
| SARAH SEBREN,                              ) | |
|              Plaintiff,      ) | |
|                    ) | No. 1:18-cv-00667-MSM-PAS |
|         v.                                      ) | |
|                    ) | |
| CASBY HARRISON,                          ) | |
|             Defendant.    ) | |
| _____ ) | |

## OPINION

Mary S. McElroy, United States District Judge.

This case involves a wage dispute, filed by Sarah Sebren, a former employee of the defendant, Casby Harrison, and his law office, Harrison Law Associates ("HLA"). Ms. Sebren worked for Mr. Harrison for many years, first as a secretary/assistant, then as an attorney. She sued under the Fair Labor Standards Act ("FLSA") (Count I), 29 U.S.C. §§ 206 and 216(b), the Rhode Island Minimum Wage Act ("RIMWA"), R.I.G.L. § 28-12-1 _et seq._, and the Rhode Island Payment of Wages Act ("RIPWA"), R.I.G.L. § 28-14-19.2(b) (both Count II).[1] The essence of the lawsuit is that Mr. Harrison misclassified Ms. Sebren as an independent contractor during the entire period of her employment, that he failed to pay her minimum wage, and that he failed

---

[1] Sections 28-12-3 and 28-12-4.1 set forth the law with respect to payment of minimum wages and overtime in Rhode Island; section 28-14-19.2 authorizes a private right of action.

1

to pay her overtime even though, she contends, she worked significant overtime hours virtually every week that she was employed by him.  In addition, Mr. Harrison seeks a portion of the contingency fee in a case begun by Ms. Sebren when she worked for his law practice but concluded by her with a settlement reached after she left his employ.

Rhode Island law provides a three-year statute of limitations.  R.I.G.L. § 28-14-20(b).  Ms. Sebren can recover for any wages unlawfully withheld from her for the period December 10, 2015,[2] through the date she left Mr. Harrison's employ on December 29, 2017.

## BACKGROUND

The Court issued two previous substantive decisions before it conducted a bench trial in February and March 2022.  The Court previously granted in part and denied in part Ms. Sebren's Motion for Partial Summary Judgment.  Based partly on a concession by Mr. Harrison, the Court found Mr. Harrison liable under the FLSA and RIPWA for misclassifying Ms. Sebren as an independent contractor instead of as an employee.  *Sebren v. Harrison,* 552 F. Supp. 3d 249, 257-58 (D.R.I. 2021) ("*Sebren I*").[3]  That ruling entitled Ms. Sebren to minimum wage and overtime protections of both the federal and state statutes while she worked as a non-attorney, and to the same protection of the state statutes for her legal work after she passed the Bar in

---

[2] The complaint was filed on December 10, 2018.

[3] Count III, alleging unjust enrichment, was dismissed early in the case.  (ECF No. 46.)

July 2017.[4]   In addition, the Court granted the Plaintiff's Motion for Summary Judgment on six counterclaims brought by Mr. Harrison, *except* that the Court denied summary judgment on that portion of Counterclaim I that claimed entitlement to a portion of a contingency fee received by Ms. Sebren for settling a case for a person who was previously a client of HLA. *Sebren I* at 63.

The Court did not address damages in connection with its summary judgment rulings.   It did, however, assess a $3,000 penalty against Mr. Harrison for violating the RIPWA by misclassifying Ms. Sebren over a long period of years. *Id.* at 62.

The second substantive decision denied Mr. Harrison's post-trial Rule 52 Motion which raised for the first time a challenge to whether either Mr. Harrison's firm or Ms. Sebren herself engaged in "interstate commerce" to such an extent as to make the FLSA applicable.   The other two issues concerned whether Ms. Sebren's evidence supported certain conclusions related to damages. *Sebren v. Harrison,* No. 18-cv-00667, 2022 WL 1063860, at *1 (D.R.I. April 8, 2022) ("*Sebren II*").   The Court denied the Motion, finding Ms. Sebren protected under the FLSA.   The Court reserved on damages for the point when other damages issues would be decided.   That time is now.

This Opinion addresses two separate issues that remain in the case:

1.  Did Ms. Sebren breach a contract with Mr. Harrison concerning the distribution of a contingency fee received when she settled a personal injury

---

[4] Once she passed the Bar, Ms. Sebren was exempted as a professional from the protections of the FLSA.   The Court rejects the idea that because she continued to do non-legal tasks, she was not a professional employee under the FSLA.   The minimum wage benefit of the RIMWA is greater than that of the FLSA.

case for a person who had initially been a client of Harrison Law Associates
("Client")?

2. What are the damages for the violations of wage and hour statutes and, if
Mr. Harrison is entitled to a portion of the contingency fee Ms. Sebren
collected, to what amount is he entitled?

## I.  Breach of Contract and the Contingency Fee (Counterclaim I)

Mr. Harrison maintains that he is entitled to a share of the contingency fee
Ms. Sebren received when she settled for Client an automobile accident case for $1
Million.

### A.    Evidence

The Client was initially represented by HLA, and the intake was performed by
Ms. Sebren.   She was the exclusive contact person for the Client while he was
represented by HLA. Mr. Harrison never spoke to him except inconsequentially
during one phone call; only Ms. Sebren worked on Client's case.   Mr. Harrison
testified that he supervised Ms. Sebren on the case which "is a lot of work," but that
he made only three notations of time he personally worked on the case, totaling 2.35
hours.  (Tr. III, at 34-36.)[5]  He explained he was "less meticulous" about keeping time
records in contingency fee cases.  (Tr. III, at 34.)

Mr. Harrison testified that not long after the inception of Ms. Sebren's legal
work on Client's case for HLA, the parties agreed that Ms. Sebren would receive no
compensation for her legal work on the case except that she and Mr. Harrison would

---

[5] Transcript I ("Tr. I") is that of February 28, 2022; Transcript II ("Tr. II) is that of
March 1, 2022;" and Transcript III ("Tr. III") is that of March 2, 2022.

split 50/50 the contingency fee he expected to receive, and Ms. Sebren would wait for payment until the case settled.[6]  The agreement was never in writing.  (Tr. III, at 38.)  Ms. Sebren disputes any such agreement. (Tr. I, at 88-89.)  Mr. Harrison testified that sometime around September 2017, Ms. Sebren said her financial circumstances would not allow her to continue to delay receiving any payment for the work she did on Client's case.  He testified they modified the agreement so that Ms. Sebren would receive an hourly wage of $50/hour for *half* the hours she worked on that case, and that she would be paid "more" at a later date.  Mr. Harrison testified that the "more" would be 50% of the contingency fee (presumably less what she had already been paid). (Tr. II, at 190).  Ms. Sebren testified in contrast that she expected simply to be paid for the remaining hours at $50/hour once the cash was available from the contingency fee. (Tr. I, at 80, 83-84.)

When Ms. Sebren left Mr. Harrison's employment, on December 29, 2017, she retained the Client's file, which was in her possession with permission because she had been working on the case for HLA.  She notified Client that she had left HLA's employment and no longer represented him.  Client then retained her to continue to

---

[6] Both Mr. Harrison and Ms. Sebren testified that they anticipated a favorable settlement up to the policy limit. (Tr. II, at 191).  Client was hit by an automobile as he was standing by the side of the highway and he suffered extreme physical injuries necessitating extensive medical treatment. They both believed liability was indisputable and that the damages were in excess of the $1M policy limit.  Thus, receipt of roughly $333,333 was certain provided that Client did not retain a different attorney.

represent him. *Sebren I* at 262. Ms. Sebren subsequently settled Client's case and placed in escrow the contingency fee of approximately $333,333.

Ms. Sebren maintained that when she left HLA, there was no discussion or any agreement about any monies due her for previous work on Client's case or what the disposition might be were a contingency fee subsequently received by her. Mr. Harrison testified that he asked her directly if she was going to "honor" the contingency fee split and she replied that she believed she did not have to. According to him, she said she had read case law and decided that Mr. Harrison was entitled only to "*quantum meruit* to be reimbursed for the billable time that I billed when I was at your firm." She did not deny that there had been such an agreement, according to Mr. Harrison. (Tr. III, at 18-19).

Mr. Harrison testified that as early as September 2017, he asked Ms. Sebren to send an "*Asermely*" letter to the insurance company in Client's case.[7] (Tr. III, at 17.) Mr. Harrison testified that he asked her at least twice to send that letter, believing that the insurance company had either 30 or 60 days to respond to the demand. He referred to an email from Ms. Sebren in which she opined that the medicals, up to $150,000 at that point, were growing quickly and were sufficient by then to support a demand letter for the full policy limit. Ms. Sebren delayed sending

---

[7] An "*Asermely*" letter is a demand to an insurance company for settlement within the policy limits. If the insurer denies settlement at that amount, but a trial then results in a final judgment exceeding the policy limits, the company can be held liable for the amount in excess of the policy limit. *Asermely v. Allstate Ins. Co.,* 728 A.2d 461, 464 (R.I. 1999).

the *Asermely* letter until February 9, 2018. (Tr. II, at 61; Tr. III, at 12.) Ms. Sebren testified she did not start collecting the medical bills until January 2018. (Tr. II, at 37:23-39:24.) Plaintiff's Exhibit 8, however, a record of time spent on the Client case by Ms. Sebren while at HLA, reflects time spent collecting medical records in October and November 2017. A specific note for December 4, 2017, indicates that she spent 3.15 hours following up on bills and records and cataloguing those received and still outstanding. (Exh. 8, page SS 39.) Mr. Harrison testified that at the end of December 2017, he saw that the file contained a lot of medical expense documents. (Tr. III, at 21.)

Some tabulation of Ms. Sebren's time spent on Client's case was recorded in the requests for payment she periodically submitted. She noted the number of hours she worked, but also that her compensation for those hours would be covered by the "50%" split of the contingency fee. *See, e.g.,* Plaintiff's Exh. 2.[8] There was no evidence introduced concerning any legal work performed after the *Asermely* letter was sent and before a settlement was reached in April. The proceeds were received in May 2018.

---

[8] In particular, the Request for Payment covering Sept. 29, 2017 to Oct. 16, 2017, specifically refers to the "1/2 shared risk for [Client]." (Exh. 2, at 26.) The natural inference from the term "shared risk" is that it refers to a contingency fee, not simply a delayed payment. Ms. Sebren testified that it referred to the delay in payment for 50% of her hours until after settlement, Tr. I, at 80, but that makes no sense as a payment that is promised but delayed is not a "risk" at all.

## B.    Factual Findings

The Court makes the following findings of fact pursuant to Rule 52 (a)(1) of the

Federal Rules of Civil Procedure:

1. The Client was referred to Mr. Harrison by someone in his professional network.  Ms. Sebren's involvement came about only because of her employment by Mr. Harrison.

2. Mr. Harrison offered to share the contingency fee 50/50 with Ms. Sebren in lieu of paying her $50 per hour for her legal work on the case.  That agreement was thereafter modified such that she would be paid $50/hour for one-half her hours and delay any payment for the remaining hours until the contingency fee was received.  The fair implication was that at that future time she would receive one-half the contingent fee less whatever she had been paid to that date for work done.  That offer presupposed that Mr. Harrison would be receiving the fee as the lawyer settling the case.  There was no agreement on a split of a contingency fee in any other circumstances.  There was no agreement on any compensation to Mr. Harrison once a fee was received after Ms. Sebren left HLA.

3. Ms. Sebren by her own admission was spending an enormous amount of time on the Client's case from the moment HLA was retained.  It is more plausible than not that she would have agreed to forego prompt payment for her time if all she anticipated was ultimately receiving the same $50/hour that she would receive had she been paid weekly.  To accept her explanation, the Court would have to believe that pure generosity of spirit moved her to be willing to delay being paid indefinitely until the contingency fee was received, with no consideration at all for the delay in payment.  The Court finds Mr. Harrison's explanation more credible.

4. The expense records produced by Ms. Sebren reflect that she billed for only one-half of the hours she worked on Client's case.[9]  The Court is hard-pressed to accept  that Ms. Sebren would put in the number of hours she claimed she worked on this case unless she anticipated a big payout at the end.   Nor is it likely that she would have put up with Client's difficult and at times abusive behavior were she not expecting a

---

[9] The notations on the Requests for Payment, of a delay in payment for one-half the hours, are not definitive for either party.  The dispute is whether at the *end* of that delay, when the contingency fee was paid, she would receive only $50/hour for the as yet unpaid hours or a portion of the contingency fee.

big payout. This Client's case was unusual: both parties testified Client was unusually demanding and expected Ms. Sebren to be available at his beck and call nearly 24/7. Much of the time was spent simply doing errands for him and running interference when his tempestuous personality put him at odds with hospital personnel and others. Mr. Harrison was not only willing but seemingly pleased by the arrangement whereby only Ms. Sebren would have contact with the client. Client was unpleasant enough that Ms. Sebren sometimes questioned whether she could continue to handle the stress, and she termed the case "a living nightmare." (Tr. II, at 127.) Ms. Sebren testified that she hoped for a big payday and was willing to put up with the Client calling her day and night, a "difficult" situation, because she was afraid of losing the Client if she did not. (Tr. II, at 58). She acknowledged she expected a "fee sharing bonus." (Tr. II, at 111). The Court finds that the anticipated big payday *had* to mean more than simply the same $50/hour that was her pay for any client work. Mr. Harrison's testimony that she continued to represent the Client because of the carrot of an uncommonly large fee *going half to her,* is credible. Mr. Harrison's testimony that Ms. Sebren declined his offer to hire a non-attorney to run errands for Client because "she needed to be the only one to respond to [Client's] requests," (Tr. III, at 16), is also credible and consistent with her expectation of more than routine compensation at the end of the case.

5.  The bulk of the investigatory work to support a claim for the maximum policy limit had been done by Ms. Sebren before she left Mr. Harrison's employ. The Court finds that the majority of the legal preparation work was performed on this case prior to Ms. Sebren's departure from HLA. There was, indeed, very little legal work actually done on Client's case, but the intake process, the investigation of the policy, and the gathering of police reports and medical damages information appeared to be ongoing through November. Ms. Sebren's contention that she did not collect medical bills until January is inconsistent with the email in which she reported that the medical expenses had already reached $150,000 by mid-September and inconsistent with her time records and is therefore not credible. The only legal work that had not been completed when Ms. Sebren left HLA was the drafting and sending of the *Asermely* letter, which was done after her departure. There was no testimony by Ms. Sebren of any other legal work performed on the case at all. The inference is clearly reasonable that the policy was paid out at its maximum coverage limit without negotiation and the Court draws that inference.

6. The case was ripe for a demand letter before Ms. Sebren left Mr. Harrison's employ. The testimony was that the legwork had been done by the time Mr. Harrison began pressing her in mid-September to send out the letter. Although Mr. Harrison reminded her, she neither did it nor offered a reason for the delay. The letter was actually sent on February 9, not long after she left HLA. By December 28, when she spoke to Mr. Harrison about the contingency fee, Ms. Sebren had formed the opinion that if she took the case with her while it was still unresolved, she would owe Mr. Harrison simply for the very limited time he had personally spent on the case. The Court draws the inference that Ms. Sebren intentionally delayed sending out the *Asermely* letter until after she left HLA.

7. There is a fair inference, which the Court draws, that Ms. Sebren's non-legal work in service of this client continued at least until the proceeds were received in May 2018.

## C. Legal Conclusions

### (1) Breach of Contract

Even though the Court believes Mr. Harrison initially offered to split the contingency fee with Ms. Sebren, the undisputed testimony was that they never discussed a scenario in which Ms. Sebren would no longer be associated with HLA when the Client case was settled. The Court has already found that there was an offer from Mr. Harrison to split the contingent fee, but that it was predicated on the factual assumption that it would be *his* to share – a circumstance that did not come to pass. When Ms. Sebren finally left the firm, there was *no* discussion of splitting any fee and she clearly expressed her unwillingness to do so. The most basic element of a breach of contract claim is that there has been a mutual agreement of the parties. *Doe v. Brown University,* 210 F. Supp.3d 310, 330 (D.R.I. 2016). A contract requires "mutuality of agreement, and mutuality of obligation." *R.I. Five v. Medical Assoc. of Bristol Cty. Inc.,* 668 A.2d 1250, 1253 (R.I. 1996). In the absence of a mutual

10

agreement to share any fee which *Ms. Sebren* would receive, or even any fee received were she and the firm to part company, there was nothing to "breach." The Court therefore GRANTS Ms. Sebren's Motion to Dismiss that portion of Counterclaim I that claims a breach of contract.

(2) *Quantum Meruit*

Even if there had been a mutual agreement to split the contingency fee regardless of when it arrived, that agreement would have terminated by law when Ms. Sebren left the firm, taking the case with her. The law appears clear that a discharged attorney loses the right to collect on the contingency fee agreement and is entitled to compensation only on a *quantum meruit* theory, as Ms. Sebren contends. *Provanzano v. National Auto Credit, Inc.,* 10 F. Supp. 2d 44, 48 (D. Mass. 1998); *Dobbs v. DePuy Orthopedics, Inc.,* 885 F.3d 455, 457 (7th Cir. 2018) (attorney could not recover contingent fee after discharge but was awarded the whole fee on alternative *quantum meruit* theory). Rhode Island law is consistent. In *Tarro v. Checrallah,* 60 A.3d 598, 602 (R.I. 2013), the Court held that the occurrence of the contingency – disposition of the case – must occur before discharge to entitle the terminated attorney to the contingency fee. An attorney discharged without cause prior to full performance, however, *is* entitled to be compensated on a *quantum meruit* basis. *Kopelman & Associates, L.C. v. Collins,* 473 S.E.2d 910, 917 (W. Va. 1996) (variety of factors to be considered, including the relative risks, the degree of skill, the amount of recovery, and others).

11

Because Ms. Sebren left HLA prior to the disposition of Client's case, it is clear that Mr. Harrison, as the sole proprietor of HLA is entitled to a *quantum meruit* recovery. The more difficult task for the Court is to determine what the *quantum meruit* value is to which Mr. Harrison is entitled.

There seem to be two methods courts use in determining *quantum meruit* compensation for legal services provided by a law firm whose associate has left with a contingent fee case that is subsequently settled. The first is to measure the value of those services provided by the firm prior to the separation.[10] That method takes account of the amount paid by the firm to the departing attorney for the services rendered. Here, according to Ms. Sebren's records, Mr. Harrison paid her $1,529.75,[11] representing $50/hour for one-half of the legal time she expended on the case from mid-September to the day she left. (Plaintiff's Exh. 2.) He is entitled to recoup that amount. But the amount Ms. Sebren was paid on an hourly basis is but a small

---

[10] Some courts have identified an array of factors that should be considered in the "value" approach. *DePuy Orthopedics, Inc.*, 842 F.3d at 1050-51 (time and labor, attorney skill and standing, nature of case, novelty of case, responsibility of managing case, usual and customary charge, and benefit to client); *Anderson v. Anchor Org. for Health Maintenance*, 654 N.E.2d 675, 682 (Ill. App. 1995) (consider services performed, time expended, hourly rate, skill of attorney, nature of case, difficulty of issues, importance, degree of responsibility required, usual and customary charges for comparable services, and the benefit resulting to the client). An "enhancement" can be added if the "value" method does not adequately reflect the intangibles such as risk that the firm took in accepting the case. *Id.* at 683 (enhancement vacated as unjustified).

[11] Mr. Harrison in his post-trial Memorandum claims a much larger sum of approximately $5,500, but that seems to reflect *all* the hours Ms. Sebren spent on the Client's case, and a rate of $50/hour when she testified that for many hours she was paid, at her suggestion, only $40/hour. The $1,529.75 calculated by the Court reflects those 35.44 hours that are clearly indicated as paid on Plaintiff's Exh. 2, at a rate of $40 or $50/hour as noted on the sheets.

component of a more complex and imprecise equation.  There is no question that the Client's case was referred through the networking group to which Mr. Harrison belonged, and of which he had been an active member for years.  (Tr. II, at 187.)  He testified about the time and effort he expended to remain a member of the group and the cases he obtained because of his membership.  (Tr. II, at 185-186.)  He was referred the case presumably also because of his skill and expertise in personal injury matters.  Moreover, while it may be difficult to quantify – and there was really no testimony addressing this point – Mr. Harrison would deserve compensation for all the time Ms. Sebren spent on the case – doing legal and non-legal tasks – when she could have been amassing billable time for other clients for which Mr. Harrison would have been paid.  Part of the loss to Mr. Harrison of having Ms. Sebren tied up on the Client's case was the loss to him of other fee-generating ways to use her time.  According to Ms. Sebren, the amount of time she expended on Client's case was extraordinary.

A second method of determining how much of a contingency fee the original law firm should receive compares the work done while at the firm with that done by the departing attorney after leaving.  It attempts to reach an equitable distribution that reflects the relative work and achievement of each actor in making the contingency fee come to pass by successfully disposing of the case.  So, for example, where little work was performed before the associate attorney's departure, the firm left behind would receive very little.  On the other hand, if so much of the work had been done to earn the fee that the departing lawyer's contribution after leaving was

13

negligible, the firm would be entitled to all, or nearly all, the fee. *See, e.g., Pumphrey v. Empire Lath & Plaster,* 144 P.3d 813, 816 (Mont. 2006) (firm to receive a percentage of contingent fee determined by calculating the percentage of the departing attorney's hours worked at the firm against those worked after departure); *Salem Realty v. Matera,* 426 N.E.2d 1160, 1161 (Mass. 1981) (court not convinced there was substantial performance).  In *DePuy Orthopedics,* 842 F.3d 1045, 1050-51 (7th Cir. 2016), for example, the settlement funds were not received until a month after the departing attorney left with the case, but the essence of the settlement had already been agreed on by that time.  Following an appeal after remand, the Seventh Circuit found reasonable under those circumstances the district court's awarding of the *entire* contingency fee to the firm.  *DePuy Orthopedics, Inc.,* 885 F.3d at 457 (*aff'ing* after remand).  *See Hofreiter v. Leigh,* 465 N.E.2d 110, 114 (Ill. App. 1984) (original attorney was entitled to one-quarter of the fee because he had done one-quarter of the work).  *Cf. Tarro v. Checrallah,* 60 A.3d 598, 602 (R.I. 2013) (if first counsel has "already substantially performed the duties owed to the client, and only 'minor and relatively unimportant deviations remain to accomplish full contractual performance,' the initial attorney is entitled to the entire contingency fee.").[12]

---

[12] *See* Ewing, "Quantum Meruit in Ohio: the Search for a Fair Standard in Contingent Fee Contracts," 18 U. Dayton L. Rev. 109, 117 (Fall 1992) (substantial performance when a lawyer was discharged without cause, particularly if there has been an attempt by the client to avoid paying, may justify payment of the entire fee, but a court still must examine the amount of work done pre-discharge).

An equitable approach that looks at the amount of work each attorney contributed to the success of the case is consistent with the Rules of Professional Conduct on sharing fees between attorneys generally. Fee-sharing is permissible if the distribution takes account of the relative amount of work performed by each. "Both the Model Rules and the Model Code permit a division of fees that is in proportion to the service performed by each lawyer. Model Rules of Prof'l Conduct R. 1.5 (1983); Model Code of Prof'l Responsibility DR 2–107(A) (1980)." *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,* 178 F. Supp. 9, 15 (D. Mass. 2001).[13]

A division of the contingency fee in accordance with the relative performance of the attorneys is responsive to many concerns. First, it is equitable, giving to each in proportion to what each has "earned." In doing so, it avoids a windfall for one at the expense of the other. Second, because it takes into account the time expended by each, during which the attorney is not generating billable hours on other cases, it spreads the "risk" that is the hallmark of contingency fee arrangements. And finally, it disincentivizes the successor attorney from deliberately delaying a settlement until

---

[13] The Rules require consent of the client to the fee-splitting arrangement. In this situation, however, the client's decision to terminate HLA and retain Ms. Sebren prompts a fee allocation to each as a matter of law, since HLA would be entitled to payment in *quantum meruit* for the services it had rendered. In addition, unlike a fee-splitting agreement between attorneys at the inception of a case, as where one attorney refers the case to another, Mr. Harrison's compensation is coming out of the share that the Client has already lost his interest in: the 33-1/3% of the total award. The Client is totally unaffected by whether the one-third contingency goes entirely to Ms. Sebren, or is split between the two attorneys, and equally unaffected by the percentage of the split.

the original attorney has been left behind.  That is a concern in this case for the reasons the Court has previously enunciated about the timing of the *Asermely* letter.

When measured against the yardstick of a proportionately fair distribution, the Court finds the deservedness of each attorney nearly equal.  The case was "alive" from July 2017 to May 2018, a period of 10 months.  It resided with HLA for just over five of those months, July through December.  To the extent that Ms. Sebren's hand-holding and baby-sitting efforts kept the client happy and kept the fee nearby, the inference from the testimony is that her activities along those lines continued after her December 29th termination as they had before – again about a 50/50 investment.  There was no indication that what she did for the Client after termination was any more or less difficult than what she did before.  Any lost income from other cases accrued to both HLA and Ms. Sebren about equally while she catered to Client.  Thus, they shared equally in the risk – although in very real terms there was hardly a risk in this clear-liability case.  Finally, the difficulty of the work performed before termination – gathering medicals, investigating the policy, and compiling the information necessary to write the letter – is relatively equal; none of it took exceptional skill.

Some weight must be given to the fact that it was Mr. Harrison's reputation and contacts that brought in the case.  On the other hand, some weight should also be given to the client's preference in following Ms. Sebren out of HLA and the fact that she carried through to the end.

The Court finds the equities almost equally deserving for both, and for that reason awards 55% of the contingency fee to Ms. Sebren, less what she was paid previously for her time spent on this case by Mr. Harrison. Mr. Harrison is entitled to receive back what he paid Ms. Sebren for time on the Client's case and, in addition to that, 45% of the contingency fee based on the amount of work done under HLA's auspices.

## II.   <u>Wage and Hour Violations</u>

Ms. Sebren's claim is based on a contention that she was not paid at least minimum wage for all the hours she worked and that she was not paid overtime at all despite working more than 40 hours per week.

### A.   Evidence

Ms. Sebren and Mr. Harrison differed sharply in their descriptions of the parameters of Ms. Sebren's work. They both agreed that until July 2017 she was employed as a secretary/assistant and after July 2017 as an attorney. Ms. Sebren maintained that even after she passed the Bar, much of her time was spent on non-legal tasks, those she termed "administrative." Mr. Harrison testified that many of these functions were basic ones that lawyers often carried out for themselves in small offices: copying, filing, making case entries, etc. The most relevant disagreement is Ms. Sebren's contention that she worked a basic 9 a.m. to 5 p.m. day and was required to be on-site through most of a conventional workday. On top of that, she testified, she frequently worked nights and weekend hours. A core claim is that she worked an average of 50 hours per week at least 49 weeks per year, to which she testified.

17

Mr. Harrison contradicted her.  He testified that while he expected her to run the office and be on-site much of the time, that was not a rigid requirement and she spent significant time carrying on personal business.[14]  He testified that she was in and out of the office frequently.  Moreover, he was adamant that she worked minimal, infrequent overtime and never because he required it.

Neither one of them kept records, except as described below.  Ms. Sebren's assertions are bolstered by emails and text messages that carry a weekend or evening time stamp, but because there were no time records kept for those days, an email sent at 7:30 p.m. from her telephone, for example, does not indicate a workday that spanned 10-1/2 hours:  it simply signifies a few moments spent in the evening sending an email.  Moreover, even during the Fall of 2017 when she was consumed with the Client's case, Ms. Sebren kept a log of work on the Client's case that reflects only minimal weekend hours.  *See* n. 15, *infra;* Plaintiff's Exh. 8.  Mr. Harrison's testimony about how much Ms. Sebren worked depends more on inferences than direct observations.  HLA occupied small office space, with individual offices off a hallway.  Both Ms. Sebren and Mr. Harrison could come and go without passing the other's door.  Mr. Harrison testified that he "would have" been aware of when Ms. Sebren was in the office, although it seems he arrived later than she did, and he was certain he saw neither her nor her automobile on evenings when he worked late.

---

[14] Ms. Sebren acknowledged under cross-examination that neither the office Manual for Employees nor a memorandum distributed to employees of guidelines included a 9 a.m. to 5 p.m. on-site requirement.  (TT II, at 32-33).

Ms. Sebren maintained that her pay arrangement with Mr. Harrison from the very beginning of her employment was that she would be paid only for time that clients would ultimately compensate him for.  In other words, she testified, she was to be paid only for hours spent on cases where Mr. Harrison charged hourly rates and on contingency cases where he ultimately received a contingency fee.  She understood from the beginning, she said, that she would not be paid for any hours for work she did for the firm generally or on client cases that turned out not to be fee-generating for Mr. Harrison.  Mr. Harrison contradicted that and claimed she was paid for all hours worked.  Ms. Sebren's understanding of the arrangement would be unlawful, as she was required by law to be paid for all hours worked.  Indeed, R.I.G.L. § 28-14-19.2(c) specifically provides that "[n]o agreement between the employee and the employer to work for less than the applicable wage . . . or to work under terms and/or conditions in violation of applicable law is a defense to an action brought pursuant to this section."  The same is true of federal law.  *Pingatore v. Town of Johnston,* C.A. No. 11-0685, 2011 WL 6056891, at *3 (D.R.I. Oct. 31, 2011) (town conceded principle that "an employee may not . . .  agree to a pay plan that violates the FLSA.").  With respect to Mr. Harrison's contention that she was actually paid for all hours worked regardless of the fee arrangement with clients, the Court, for reasons outlined below, rejects that assertion.

## B.   Factual Findings

The Court makes the following findings of fact pursuant to Rule 52 (a)(1) of the Federal Rules of Civil Procedure:

1. The Court is not persuaded by Ms. Sebren's claim that she worked an average of fifty (50) hours per week for 49 weeks each year.  Ms. Sebren's own time records belie the plausibility of that contention.  The record contains Requests for Payments submitted by Ms. Sebren on a periodic basis beginning August 8, 2016 and concluding December 21, 2017.  (Plt. Exh. 2)  Until she passed the Bar, they reflected hours she billed at $30 per hour.  According to her testimony, she billed for hours attributable to a specific client (and therefore billable by HLA), but not for "general" time spent maintaining the law office.  Every one of these Requests for Payment shows a small number of hours billed relative to the hours in a normal work week.  For example, between September 23, 2016, and October 5, 2016, a total of 9 working days which would amount to 72 working hours, Ms. Sebren requested payment for only 27.1 hours.  (Plt. Exh. 2, p. 2).  That would mean that she requested no payment for 44.89 hours.  That is hard enough to believe were a workweek a normal 40-hour week.  Ms. Sebren's claim that she would bill for only 27.1 hours out of two *50-hour* workweeks stretches the imagination.[15]  Again, from December 2, 2016 – December 20, 2016, she billed for only 40.7 hours out of what would be 104 hours in normal 40-hour weeks (Plt. Exh. 2, p. 5); her claim that she actually put in three weeks of 50-hours but billed for only 40.7 out of a total of 150 hours is not credible.[16]  Out of 96 working hours over the 12 days from January 18, 2017to February 2, 2017, she requested payment for only 11.85 hours – barely 10% of a regular 40-hour workweek.  (Plt. Exh. 2, p. 9)

2. The Requests for Payment, such as they are,[17] cover fewer than half the weeks between December 10, 2015, and December 29, 2017.  The burden of

[15] The Court does credit her testimony that she would not bill for time HLA could not bill to a client at the time the work was done because of a contingency agreement. For example, her Requests for Payment for February 24, 2017– March 2, 2017, and March 10, 2017 – March 30, 2017 backs out 7.5 plus .9 hours spent on client cases she identified as contingency fee cases.

[16] It does not make sense that Ms. Sebren would be required to put in so much overtime for a law office where the great majority of her hours could not be billed to a client.  Nor does it make sense that those extra hours – allegedly 10 hours per week – would be spent on office chores like filing and cleaning up or personal errands for Mr. Harrison.

[17] There are many gaps in the Requests for Payment.  For example, there is one covering January 4 to January 11, 2017, but the next one spans January 18 to February 2, 2017; there are no requests before August 8, 2016, and no requests between August 12, 2016, and September 23, 2016.

record-keeping legally falls on Mr. Harrison.[18]   The Court will, therefore, draw an inference favorable to Ms. Sebren and find as fact that she regularly worked 40 hours per week, less the three weeks per year that she agrees were unworked holidays, vacation and personal time, and less certain specified time spent studying for and taking the Bar Examination. This finding carries with it the determination that she did not routinely work 10 hours per week overtime as she claimed.[19]   Mr. Harrison's Plaintiff Exh. F concedes 10.6 hours of specific weekend overtime in 2016.   Exhibit I concedes 26.2 such hours in 2017, of which all but 5.95 were spent on the Client's case.

**Wage and Hour Damages**

The testimony was undisputed that for hours that were to be paid, Ms. Sebren was to receive $30/hour, and, once she passed the Bar, that amount was increased to $50/hour for legal work.   She testified that legal work was considered *any* work, even copying or filing, if performed on a specific case on behalf of a specific client (Tr. I, at 139-40.)   Administrative work continued to be tasks she performed for HLA as an entity, such as answering phones, performing client intake, and functioning as an office manager. (Tr. I, at 40-41, 43.)

From time to time, she submitted Request for Payment forms, delineating the work she did and billing $30/hour or $50/hour (and, sometimes, $40/hour) accordingly.   This protocol began in 2016 and the first submission was for work done from August 8, 2016, forward.  (Tr. I, at 29-30.)   Mr. Harrison testified that he paid

---

[18] R.I.G.L. § 28-14-12 requires the employer to keep accurate record of hours worked and wages paid.   Federal law also requires employers to keep records.   29 U.S.C.A. § 211(c).

[19] It is significant that Plaintiff's Exh. 3, which is a record kept by Ms. Sebren of the time spent on the Client case, reflects only 6.5 hours of weekend time in 2017.  (Exh. 3, at SS19, SS25, SS26, SS27, SS28, SS37, SS43.)   This time is compensated by the contingency fee.

all Requests in the amounts submitted, whether clients paid him or not.  (Tr. II, at 174.)  He further testified that he would frequently round up either hours or dollars. (Tr. II, at 182-83).  Ms. Sebren confirmed that he would sometimes do that.  (Tr. II, at 11.)  Occasionally she would receive a bonus when a large fee came in, although the parties described specifically only one such occasion involving a $12,500 bonus. (Tr. II, at 11-12.)

Ms. Sebren testified that she frequently underbilled because she believed from her experience that Mr. Harrison would question the amount of time she spent; she therefore proactively struck hours from her requests that she believed he would not accept.  (Tr. II, at 93, 119.)  There is no corroborating evidence of this, as none of the Requests reflect "slashing" her time or crossing-out or reducing time; Ms. Sebren essentially maintained that she did not bother to submit payment requests for time she believed Mr. Harrison *would* strike.  He testified he did not reduce her hours. There is no way for the Court to determine the type of work performed in the hours Ms. Sebren claims she did not bill because she thought Mr. Harrison might "strike" them as excessive.   This contention of hers is wholly nonspecific and any characterization by the Court of the work performed during those hours would be entirely arbitrary.   Ms. Sebren is, nonetheless, entitled to some compensation for these undifferentiated hours.  Since there was no agreement, however, about her rate of pay for administrative work done for HLA itself – answering phones, opening the

office, doing payroll, and the like -- the Court finds she is entitled to minimum wage for those hours.[20]

The most critical testimony concerned the number of hours worked by Ms. Sebren. She testified that she worked an average of 50 hours per week for 49 weeks per year. She calculated that by first estimating that her typical workweek was 50 hours.[21] That estimate was based on her belief that she was required to work – and did work – from 9 a.m. to 5 p.m. each weekday, and that she additionally worked

---

[20] The Court rejects the defendant's suggestion that it should take all the hours Ms. Sebren worked and multiply them by the minimum wage at the time to see if the amount she was actually paid exceeded that total. This approach to calculation is consistent with the method described in *United States v. Klinghoffer Bro. Retail Corp.,* 285 F.2d 487, 490 (2d Cir. 1960), which would take the amount paid over a workweek and divide by the number of hours worked in that workweek to determine whether the amount paid compensated for at least minimum wage for each hour worked. To do that would be to compensate her simply at minimum wage for many of the hours spent, despite the express agreement to be compensated at $50 or $30 for hours billable to a client. She was entitled to the benefit of her bargain, which was to be compensated at $50 or $30 for certain hours worked; for the remainder of the hours, not billable to a client, the absence of an agreement leaves her entitled only to minimum wage. *See Norceide v. Cambridge Health Alliance*, 814 F. Supp. 2d 17, 23, 25 (D. Mass. 2011), discussing the inequity of the *Klinghoffer* calculation. The Court also rejects Ms. Sebren's suggestion in her testimony that she be paid $30/hour for all hours *not* covered by Requests to Pay (Tr. II, at 76); only the mutual agreement between the two entitled her to more than minimum wage at all, and that agreement specified $30/hour only for client-based work.

Moreover, the Court need not look for a specific "measuring rod" in this case to determine that there were hours worked that were unpaid. *See D'Arezzo v. Providence Ctr., Inc.,* 142 F. Supp. 3d 224, 237 (D.R.I. 2015). Mr. Harrison acknowledged throughout that the hours Ms. Sebren worked that were not attributable to a paying client were intended to be unpaid. As he explained, she would be paid only if the law office was paid for her time. (Exh.11.)

[21] Ms. Sebren testified she worked at home nights and weekends and worked more than 40 hours per week "all the time." (Tr. I, at 23-24.)

about 10 hours per week on nights and weekends. She then "backed out" from December 15, 2015, to December 29, 2017, the equivalent of three weeks per year to reflect a typical week's vacation, certain holidays she did not work, and periodic personal appointments.[22]

Consistent with its findings above, the Court is not persuaded by Ms. Sebren's testimony regarding the hours she worked. While the absence of record-keeping by Mr. Harrison places the burden on him to prove her hours worked, the Court finds that her own testimony does not support more than 40 hours/week and even that gives her the benefit of the doubt. While she testified that she was required to work 9 am to 5 pm weekdays, the testimony of a neutral witness, Tyler Pare, was that when he interned in the office, she generally came into work between 9:30 and 10 a.m. (Tr. III, at 87). Ms. Sebren acknowledged she was able to take time out of work for personal reasons and appointments. She testified that on holidays when the courts were closed, HLA was generally closed as well. The Court takes judicial notice of the official Rhode Island holidays during which the courts are closed, and they number 10.[23] Combined with the week-long vacation she generally took in the summer, that accounts already for three weeks, which is all Ms. Sebren "backed out" of a 52-week year to arrive at her conclusion that she worked the equivalent of 49 weeks. Yet when questioned by the Court, it appeared that the document she relied

---

[22] In fact, under examination by the Court, Ms. Sebren acknowledged a number of days that she had failed to back out. *See generally* Tr. II, at 74-144.

[23] New Year's Day, Martin Luther King Day, Memorial Day, July 4th, Victory Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving, and Christmas Day.

on to "back out" time not at work was woefully incomplete.  She acknowledged she had not backed out the half-time for the 7-1/2 weeks spent studying for the Bar examination, and time for taking the Bar examination.   (Tr. II, at 95, 99-100.)  In addition, she admitted she probably did not work the day after Thanksgiving. (Tr. II, at 101.).  And none of those instances of backing out time make allowances for time undoubtedly spent not working while taking care of personal and medical business.

In order to reach an "average" of 50 hours/week, Ms. Sebren would have the Court believe that during some weeks she worked 60 hours to offset weeks in which she worked 40.  Her description of occasional tasks for Mr. Harrison on weekends does not come close to that kind of continuous time spent.  While there are certainly several weekend and evening emails and text messages sent to and from Ms. Sebren relating to the law practice, many of these were not substantive and the majority reflected merely moments, not hours.

Ms. Sebren bears the burden of proving overtime hours.  *Napert v. Gov't Emp. Ins. Co.*, 36 F. Supp. 3d 237, 242 (D. Mass. 2014).  Because the Court rejects Ms. Sebren's estimation of overtime, it employs Defendant's Exhs.  F (10.6 overtime hours in 2016) and I (26.2 overtime hours in 2017), which list overtime hours based on a log kept by Ms. Sebren.  *Id.* at 4-11.  For 10.6 overtime hours in 2016, she is owed $45/hour ($30/hour at time-and-a-half) for a total of $477.  In 2017, for 2.6 hours overtime pre-admission to the Bar, she is owed $45/hour, for a total of $117.00; for 5.95 hours worked overtime as an attorney on cases other than the Client's, she is owed $75/hour ($50/hour at time-and-a-half) for a total of $446.25 under the

25

RIPWA.[24]  The remaining overtime hours were spent on the Client's case and they are compensable by the contingency fee, not by hourly wages.   The Court rejects Ms. Sebren's contention that she worked 10 hours per week of undocumented overtime. Because she testified she rarely took a lunch break (Tr. II, at 92), the Court gives her the benefit of an inference that she worked 40 hours/week on average apart from the three weeks each year on vacation and holidays that she was not in the office and the 4 weeks spent studying for and taking the Bar exam in 2017.

Although Mr. Harrison violated both the FLSA and the RIMWA, Ms. Sebren was injured only once because of these infractions, and she may recover only once. *Cf. Graff v. Motta,* 695 A.2d 486, 493 (R.I. 1997) (recovery under one tort theory precludes recovery under another for the same injury).   The First Circuit has written on the issue of awarding damages when both the FLSA and a state wage act are in

---

[24] Since Rhode Island law does not exempt her as a professional from entitlement to minimum wage because she was not paid a salary of at least $200/week (Tr. I, at 16), and since she is awarded overtime damages pursuant to state law, it does not make a difference whether she was exempt as a professional from overtime protection under the FLSA.   The Court, however, rejects the idea that Ms. Sebren should not be considered an FLSA professional because her "primary duties" continued to be clerical.   While it is indisputably true that she continued to do clerical tasks, those were tasks routinely done by attorneys in a very small practice.   Ms. Sebren was treated and held out as an associate; indeed, she introduced evidence to that effect. Attorneys make case notations, they answer phone calls, they do copying and scanning, they file documents and, indeed, they may even throw out the trash.   That does not make them non-professionals.    Ms. Sebren worked as an attorney on a number of cases according to her testimony and she was virtually the only attorney working daily on the Client case.   This case is distinguishable from *Lola v. Skadden, Arps, Slate, Meagher & Flom, LLP,* 620 Fed. Appx. 37, 41 (2d Cir. 2015), where the plaintiff, although a licensed attorney, alleged he was permitted only to carry out tasks that could have been done by a high school student (marking how many times certain words appeared in legal documents).

play.    Federal preemption does not prohibit state public welfare legislation and providing benefits under state law is not contrary to the policy of the FLSA "which is to protect employees from excessive hours and substandard wages." *Maccabees Mutual Life Ins. Co. v. Perez-Rosado,* 641 F.2d 45, 46 (1st Cir. 1981) (finding no conflict severe enough to mandate a federal override of a state provision).  Where a plaintiff relies on the FLSA to establish a violation, the plaintiff is limited to FLSA remedies. *Roman v. Maietta Constr., Inc.,* 147 F.3d 71, 76 (1st Cir. 1988).  In *Gonpo v. Sonam's Stonewalls & Art, LLC,* 41 F.4th 1 (1st Cir. 2022), the Court affirmed without discussion of this issue a district court decision construing *Roman* as permitting a plaintiff to choose a more advantageous remedy under state law *if* the violation is found under state law as well as the FLSA.  *Gonpo v. Sonam's Stonewalls & Art, LLC,* No. 16-40138-MGM, 2021 WL 1795601, at *2 (D. Mass. Apr. 1, 2021). There, Massachusetts law both provided a higher minimum wage and mandatory treble damages.  The reasoning of *Gonpo* is persuasive.  The purpose of the FLSA itself, to protect workers, would be frustrated if a plaintiff, simply by virtue of being covered by the FLSA, were prohibited from pursuing the identical claim under state law and reaping the benefit of greater damages.  The practical import here concerns the entitlement to minimum wage itself, which was $7.25 at all relevant times under the FLSA, but $9.00 in 2015 and $9.60 in 2016 and 2017 under Rhode Island law.  In addition, because Ms. Sebren did not meet the definition of "professional" under the RIMWA, she was not exempted from the minimum wage provisions even after she passed the Bar.

C.   **Willfulness and Liquidated Damages**

The FLSA statute of limitations is two years, unless a plaintiff proves that the employer's failure to comply with wage requirements was willful.  Willful breaches of the statutory obligations extend the limitations period to three years.  Willfulness is more than mere negligence.  *Hillstrom v. Best Western TLC Hotel,* 354 F.3d 27, 34 (1st Cir. 2003) (Family and Medical Leave Act violation).  It means knowing or reckless disregard of whether conduct is prohibited.  *Sanchez v. Puerto Rico Oil Co.,* 37 F.3d 712, 721 (1st Cir. 1994) (ADEA case, quoting *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 126 (1985)).  A determination of willfulness requires more than simply knowing about the law "and its potential applicability in the workplace." *Sanchez*, 37 F.3d at 721. *Accord Fryer v. A.S.A.P. Fire & Safety Corp., Inc.,* 658 F.3d 85, 91-92 (1st Cir. 2011) (willfulness requires "something more than merely showing that an employer knew about the [statute] and its potential applicability in the workplace") (alteration original).  There is no evidence of willfulness here and some evidence to the contrary.  Ms. Sebren maintains that because Mr. Harrison is an attorney, he should be presumed to know the application of the FLSA and that, therefore, any deviation from compliance may be presumed willful.  The Court declines to draw that inference.  *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 130 (1988), specifically eschewed the sufficiency of knowledge of "possible application" of the FLSA in favor of a "*knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA" (emphasis original).*  Mr. Harrison testified he had handled no FLSA cases and Ms. Sebren, having worked at HLA for many

years was certainly in a position to contradict that testimony if she knew of any wage and hours clients ever represented by HLA.  In her Post-Trial Brief, she asserts that he practiced "employment law," but there is a vast range of specialties under that rubric and handling discrimination cases, for example, involves an entirely different body of law than wage and hours claims.[25]  Moreover, Mr. Harrison filed 1099s with the Internal Revenue Service and there was no attempt to conceal that he was paying Ms. Sebren, how he was paying her and how much.  *Compare Chao v. Hotel Oasis,* 493 F.3d 26, 36 (1st Cir. 2007) (finding of willfulness under FLSA upheld based on, *inter alia,* "intentional manipulation of the records it did keep" plus the paying of employees off the books).  The absence of willfulness precludes an extended collection period under the FLSA and also causes the failure of the Court to award punitive damages.

On the other hand, Rhode Island's Wage Act defines damages to include an amount "two (2) times the wages owed to the employee for the first offense."  R.I.G.L. § 28-14-20(d).  The statute does not require a finding of willfulness or bad faith.  The Court in its discretion, considering the length of time that passed here, awards Ms.

---

[25] She also contends that she informed him of FLSA laws, but in fact the letter she cites in support of that assertion simply makes reference to HLA's ability to recruit "very bright and very good young people who have been so motivated to learn and to help the practice, that they are willing to wait to be paid, to work without benefits, to underreport their hours, to work weekends and evenings to keep up, and to work more than full time and receive compensation of what amounts to less than minimum wage."  At the same time, she disavowed any intent to "imply[]" that he needed to pay more.  (ECF No. 63-19 at 5.)  The letter does not refer to her own working conditions at all.

Sebren double the amount of minimum wage she is due and double the amount of overtime pay due under the RIMWA.[26]

### III.   Calculation of Damages

#### A.   Quantum Meruit

The contingency fee was $333,333.  The 55% of that fee that the Court awards to Ms. Sebren amounts to $183,333.15.  It appears from Exh.  2 that Ms. Sebren has already received $1,529.75 from Mr. Harrison for legal work on the Client case.  Mr. Harrison's portion of the contingency fee amounts to $149,999.85, plus a return of the $1,529.75 he paid Ms. Sebren already for her work on the Client case.

#### B.   Wage and Hour Violations

At the risk of repetition, the Court deems it important to explain how its calculation of damages was reached so that the parties fully understand.   In the calculation of damages, the Court has differentiated between hours worked based on several factors:  (a) whether they were pre- or post-Bar admission; (b) whether they were attributable to a particular client ("client hours") or were performed for HLA as an entity (or were unspecified); and (c) whether they were regular hours or overtime. With respect to client hours, Ms. Sebren is entitled to the benefit of her agreement and therefore to $30/hour or $50/hour depending on whether the hours were pre- or post-Bar admission.  With respect to all other hours, as there was no agreement on a

---

[26] Federal law provides for double damages for overtime violations, even where there is an absence of willfulness, unless the employer can demonstrate a good faith intention to follow the law manifested by attempts to ascertain FLSA requirements. *Reich v. Newspapers of New England, Inc.,* 834 F. Supp. 530, 542 (D.N.H. 1993).

specific hourly rate, she is entitled to minimum wage under Rhode Island law, which is a higher amount than under federal law.

The Court has calculated that Ms. Sebren is owed $23,727.98 for previously unpaid hours worked at an hourly rate of $9.00 per hour during 2015 and $9.60 per hour during 2016 and 2017. This figure was reached by giving her the benefit of a 40-hour workweek, less three weeks per year she estimated for holidays and vacation, and less 2 days to take the Bar Examination and 17.5 days studying for it (7 weeks, half-time). The Court then subtracted the hours, both administrative and legal, for which, according to Plaintiff's Exh. 2 and 3, she was previously paid. The Court then subtracted hours she worked on the Client case but was not paid, as those hours will be compensated by her portion of the contingency fee. What remained as wholly unpaid hours that Ms. Sebren worked is 2,478.66 hours. Because there was no agreement between the parties of any particular hourly wage for those hours, she is entitled to receive only minimum wage for them. The amount awarded, at $9/hour for a short period in 2015 and $9.60/hour in both 2016 and 2017, is $23,727.98.

With respect to overtime hours, as detailed above, she is entitled to $1,040.25 for 19.15 overtime hours spent working either pre-admission to the Bar or post-admission on cases other than the Client's case. As the Court is unpersuaded by Ms. Sebren's testimony that she worked overtime an average of ten (10) hours per week for 49 weeks per year, it bases its finding of the overtime actually worked on actual time records.

31

Pursuant to R.I.G.L. § 28-14-19.2, the Court awards double damages in the amount of $24,768.23.

## IV.    REMEDY

1. Mr. Harrison is entitled to $ 151,529.60 representing 45% of the contingency fee plus a reimbursement of what he paid Ms. Sebren for work on the Client case ($1,529.75).

2. Ms. Sebren is entitled to retain $181,803.40 of the contingency fee, after reimbursing Mr. Harrison $1,529.75.

3. Ms. Sebren is awarded $ 23,727.98 in regular wages and $1,040.25 in overtime, for a total of $24,768.23 in unpaid wages.

4. Ms. Sebren is awarded an equal amount – $24,768.23 – in liquidated damages pursuant to R.I.G.L. § 28-14-19.2.

5. Ms. Sebren is entitled to reasonable attorneys' fees as the prevailing party with respect to wage and hour violations found under 29 U.S.C. § 216(b) and R.I.G.L. § 28-14-19.2. With respect to the time expended on the contingency fee dispute, the parties shall bear their own costs and expenses.

Judgment is therefore awarded to the plaintiff for wage and hours violations in the amount of Forty-Nine Thousand, Five Hundred Thirty-Six ($49,536.46) Dollars and Forty-Six Cents. Judgment is awarded to the defendant representing his *quantum meruit* share of the contingency fee in the amount of One Hundred Fifty-Three Thousand, Fifty-nine ($153,059.35) Dollars and Thirty-five Cents.

IT IS SO ORDERED:

_____
Mary S. McElroy,
United States District Judge
October 11, 2022